IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JEFFREY R. T.,[1]
     Plaintiff,

         v.                         Civil No. 3:19cv752 (HEH)

ANDREW M. SAUL,
Commissioner of Social Security,
     Defendant.

## REPORT AND RECOMMENDATION

This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying the application of Jeffrey R. T. ("Plaintiff") for disability insurance benefits and supplemental security income under the Social Security Act. Plaintiff, twenty-one years old at the time of his benefits application, previously worked at a grocery store and as a part-time companion for individuals with disabilities. (R. at 291, 826–27.) Plaintiff suffers from Asperger's syndrome, obsessive compulsive disorder, attention deficit hyperactivity disorder ("ADHD"), depression, and irritable bowel syndrome ("IBS"). (R. at 42.)

On August 31, 2018, an Administrative Law Judge ("ALJ") denied Plaintiff's application for benefits. (R. at 36–38.) Plaintiff, proceeding *pro se*, now seeks judicial review of the ALJ's decision, arguing that the ALJ erred in (1) making several factual findings, (2) evaluating several medical opinions in the record, (3) determining the amount of social interaction that Plaintiff can tolerate, and (4) underestimating the amount of time off Plaintiff would need from work. (Pl.'s Opening Br. at 1–3, ECF No. 12 ("Pl.'s Mem.").)

---

[1]     The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

This matter is before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment,[2] rendering the matter ripe for review.[3] For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) be GRANTED, Defendant's Motion for Summary Judgment (ECF No. 18) be DENIED, and the final decision of the Commissioner be VACATED and REMANDED.

## I. PROCEDURAL HISTORY

On June 27, 2012 and July 12, 2012, Plaintiff filed applications for disability insurance benefits and supplemental security income, with an alleged disability onset date of July 22, 2011. (R. at 585–95.) The Social Security Administration denied Plaintiff's claim initially on February 12, 2013, and again upon reconsideration on September 16, 2013. (R. at 291, 307, 319, 337.)

On November 21, 2014, after holding a hearing, an ALJ found Plaintiff not disabled. (R. at 116–30.) The Social Security Administration Appeals Council subsequently reversed and remanded the ALJ's decision, finding that Plaintiff's submission of new evidence and an incomplete evidentiary record warranted further consideration by the ALJ. (R. at 355–59.) On March 13, 2017, after another hearing, an ALJ again found Plaintiff not disabled. (R. at 360–79.) On October 16, 2017, the Appeals Council reversed the ALJ's March 13, 2017 decision and remanded the case for further proceedings. (R. at 387–91.) The Appeals Council reasoned that the

---

[2]   Because *pro se* pleadings are entitled to liberal construction, this Court interprets Plaintiff's "Opening Brief" as a motion for summary judgment. *See Hawkins v. Saul*, 796 F. App'x 159, 161 n.2 (4th Cir. 2019).

[3]   The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

ALJ needed to further evaluate Plaintiff's "mild" limitations in his ability to manage himself and interact with others, the allotment of time off that Plaintiff would need during a workday, and the weight given to certain medical opinions and statements by Plaintiff's employers. (R. at 388–89.)

On August 6, 2018, the ALJ held a third hearing, at which Plaintiff and a vocational expert testified. (R. at 148–86.) On August 23, 2018, the ALJ issued a written decision finding Plaintiff not disabled. (R. at 36–53.) The Appeals Council subsequently denied Plaintiff's request for review of the ALJ's decision, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1–6.) Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## II. FACTUAL BACKGROUND

The record before the Court contains the following relevant evidence.

### A. Plaintiff's Background.

Plaintiff was born in 1990 and has always lived with his parents. (R. at 153–54.) Plaintiff alleges that he became disabled as of the age of twenty, and that he suffers from Asperger's syndrome, obsessive compulsive disorder, ADHD, depression, and IBS. (R. at 42, 292.) Plaintiff graduated from high school, taking some advanced courses, and he attended one year of undergraduate college and one year of community college. (R. at 156, 826.) Plaintiff stopped attending college because he had trouble attending class as a result of his depression and other mental impairments. (R. at 826.) Plaintiff previously worked part-time at a grocery store, but he was let go because of his inability to attend work regularly. (R. at 176–77.) Plaintiff has also worked part-time as a companion of individuals with disabilities. (R. at 154, 642, 661–62.) At most, Plaintiff had up to three clients in this position; however, as of the most recent hearing with the ALJ, Plaintiff had only one client. (R. at 154–55, 1272.)

**B. Medical Opinion Evidence.**

In February 2013, psychologist Richard J. Browne, Ph.D., evaluated Plaintiff. (R. at 826–32.) Dr. Browne noted Plaintiff's average intellectual functioning and opined that Plaintiff would only be able to perform simple and repetitive tasks in a work setting. (R. at 830.) Dr. Browne opined that Plaintiff would be unlikely "to perform [simple and repetitive] work activities on a consistent basis whereby he could complete even a partial workday much less a full workday." (R. at 830.) Dr. Browne additionally stated that Plaintiff's depression and lack of motivation "would probably interfere with him maintaining regular attendance in the workplace." (R. at 830.) He also opined that Plaintiff's capacity to interact with co-workers in a "meaningful and productive manner" is "marginal." (R. at 830.)

In August 2014, Pamela K. Waaland, Ph.D., evaluated Plaintiff. (R. at 1124–28.) Dr. Waaland noted that Plaintiff's test results revealed "generally superior intellectual skills," but that Plaintiff still had functional limitations. (R. at 1124 (described as "deficiencies in his executive functions").) Dr. Waaland observed that although Plaintiff was "motivated to do well" during standardized testing that she administered, he was "unmotivated to 'go faster'" even when instructed to do so and was "off task at times when completing independent tasks." (R. at 1126.)

Dr. Waaland also opined that Plaintiff has "the cognitive profile typical of individuals with Asperger's syndrome"; above average to superior skills in verbal associative reasoning, vocabulary, and visuospatial skills; difficulty with efficient processing, organizing, and executing plans; and significant problems related to response control and attention, even with medication. (R. at 1127.) She noted that Plaintiff was taking medications for his depression and ADHD, which alleviated some of his symptoms, but she observed that some of the medications "have not had any long-term effect" and that Plaintiff still suffered from "periods of depression." (R. at 1124–25.)

Dr. Waaland opined: "While continuing on a variety of medications and counseling regime, he has shown an increasingly restricted life style and difficulty functioning." (R. at 1127.) Dr. Waaland explained that "[a]lthough [Plaintiff] is a bright young man, he cannot independently plan and carry out his day as highlighted by his extremely low adaptive skills when compared to basic 'school learning.'" (R. at 1127.) She also opined more generally that Plaintiff "lacks energy/initiative and execution skills needed for independence and gainful employment." (R. at 1127.)

Plaintiff participated in outpatient therapy with psychiatrist Adam T. Kaul, M.D., from November 2013 to October 2014. (R. at 1141–54.) Dr. Kaul reviewed Dr. Waaland's findings and summary, and "agree[d] with the observed symptoms and recommendations." (R. at 1141.) Dr. Kaul opined that while Plaintiff "has remained compliant with his treatment plan," resulting in improvement in his symptoms and "in overall emotional and motivational functioning," Plaintiff "remains unlikely to be able to maintain independent employment at this time." (R. at 1141.) Dr. Kaul also noted that, despite these improvements, Plaintiff "continues to require external supports for self-sufficient activities, such as hygiene, scheduling, medication administration, and financial maintenance." (R. at 1141.) Finally, Dr. Kaul opined that Plaintiff suffered from gastrointestinal symptoms from his IBS and psychologically-triggered somatic symptoms. (R. at 1141.) As a result, he opined that "these ongoing episodes of gastrointestinal distress do create significant impairment in [Plaintiff's] ability to maintain consistent employment." (R. at 1141.)

Plaintiff participated in outpatient psychotherapy with Andrew J. Routh, LPC, from February 2015 to July 2016. (R. at 1226–79.) In August 2016, Counselor Routh opined that Plaintiff has a moderate limitation in responding appropriately to supervision and assessments, severe difficulty sustaining concentration long enough to timely and appropriately complete tasks,

and severe difficulty in getting to work on time and fulfilling a complete work shift. (R. at 1282, 1285.) He also opined that Plaintiff's poor executive functioning creates a "barrier to gainful employment." (R. at 50, 1280.) Specifically, Counselor Routh explained that Plaintiff's "inability to plan, initiate, adjust and maintain a strategy inhibits his overall performance within a work environment"; Plaintiff "has demonstrated little ability generalizing information from one situation to the next"; and Plaintiff "is often confused when presented with a task of choosing multiple options, [and] has difficulty with reciprocal behavior and very limited social skills." (R. at 1280.)

In January 2015, Plaintiff's family physician, Bambi Gladfelter, D.O., opined that Plaintiff has "significant gastrointestinal issues, most significantly severe chronic constipation and gastroparesis." (R. at 1215.) Dr. Gladfelter reported that although Plaintiff had seen multiple specialists, completed physical therapy, and implemented restricted diets, these strategies produced "little success." (R. at 1215.) In August 2016, having treated Plaintiff for more than two and a half years, Dr. Gladfelter opined that Plaintiff had a moderate limitation in responding appropriately to supervision and assessments and his ability to interact with co-workers is "very limited." (R. at 1285.) Dr. Gladfelter also noted that Plaintiff would be severely limited in getting to work on time and that his gastrointestinal issues would affect his ability to complete a full work shift. (R. at 1285.)

### C.  Statements from Employers.

Christine Zatkulak, who employs Plaintiff as her son's "attendant," submitted a statement regarding Plaintiff's work performance. (R. at 731–32, 760-61.) Ms. Zatkulak stated that, absent her own flexible schedule, she would not be able to employ Plaintiff. (R. at 731.) She stated that she cannot depend on Plaintiff to be available on scheduled dates for work "as he frequently calls in sick at the last minute" and "he may start the day late or end his day early." (R. at 731.) Ms.

6

Zatkulak also noted that Plaintiff "depends on his parents to navigate the details of the job" and that Plaintiff would not know how to handle many of the job's duties without his parents' help. (R. at 732.)

Kim Michaux, another parent of one of Plaintiff's clients, similarly stated that Plaintiff is "sick often and frequently absent. He leaves early very often because he is ill." (R. at 759.) She also stated that Plaintiff "spends a lot of time each day in the bathroom," gets stressed out by many tasks, and requires close supervision for tasks. (R. at 759.) Ms. Michaux further mentioned some of Plaintiff's responsibilities with her son, including bathing, dressing, and feeding him, although Ms. Michaux frequently had to assist and remind Plaintiff with these duties. (R. at 759.)

### D.  Statement from Plaintiff's Parents.

The record also contains a "Function Report" completed in 2013 by Plaintiff's parents, which discusses Plaintiff's part-time position as an "attendant" for individuals with disabilities. (R. at 700–10.) They observed that Plaintiff's responsibilities in this role primarily consisted of driving his clients, but that they had to help Plaintiff plan the day and sometimes would have to drive for Plaintiff "when he is in too much pain or becomes so depressed he isn't comfortable driving." (R. at 701.) His parents also stated that Plaintiff's depression and IBS symptoms make it difficult for him to "have daily commitments," and that Plaintiff's depression in particular can cause him to sleep all day and night and otherwise "shut down." (R. at 702, 708.) His parents further noted that Plaintiff "constantly starts projects and does not complete them." (R. at 707.) His parents stated that Plaintiff is only able to perform his part-time companion position because Ms. Zatkulak has the flexibility for Plaintiff to arrive late or leave early unexpectedly because of his symptoms. (R. at 709.) Plaintiff's parents further stated that "balancing a checking account against [a] bill is beyond [Plaintiff]." (R. at 705.) They indicated that Plaintiff participates in "little"

7

social activities, but he does participate in monthly Asperger's support group meetings and weekly Bible study, "when he feels like going." (R. at 706.) They also noted that he attends church and plays board games with a group weekly. (R. at 706.)

### E. Plaintiff's Testimony.

At the August 6, 2018 hearing, Plaintiff described his mental and gastrointestinal impairments and symptoms. He testified that his depression causes him a lack of motivation and he cannot get out of his bed on bad days as a result. (R. at 177.) He stated that he becomes very stressed interacting with people "for extended periods of time." (R. at 162.)

As to his gastrointestinal issues, Plaintiff stated that he experiences stomach pain and that he cannot control his bowel movements, which leads to "accidents." (R. at 179.) He stated that he takes medication to regulate his bowel movements, but he still cannot fully control them and therefore he occasionally has to pack spare clothes when he leaves his parents' house for extended periods of time. (R. at 166, 179.)

Plaintiff also testified about his work history. He stated that he previously worked part-time at a grocery store, fulfilling both bagging and cashier responsibilities—the latter of which involved counting change. (R. at 175, 664; Pl.'s Mem. at 1.) He testified that the job was very stressful because of the interaction he had to have with others, and that he was eventually let go because he had to call out of work too often as a result of his gastrointestinal symptoms. (R. at 162, 175–77.)

Plaintiff further testified that he currently works a "as a *caregiver* for an individual with Down's syndrome." (R. at 154 (emphasis added).) He testified that the part-time job involves taking his client out to do certain activities, such as going to the gym, the movies, bowling, mini-golf, or to get food. (R. at 155.) Plaintiff stated that the job requires about three to five hours per

day, five to six days per week. (R. at 159, 169–70.) However, Plaintiff explained that he has to frequently call out of work, arrive late, or leave early because of his depression or gastrointestinal symptoms. (R. at 158–59, 170.) He stated that he thus arrives to work late two to three times a week and is absent once or twice a week. (R. at 170.) Around once a month, Plaintiff stated that he needs his parents to pick him and his client up because he gets too depressed and it becomes dangerous for him to drive. (R. at 174.)

Plaintiff also testified about his daily activities. He stated that he drives almost every day, reads novels, plays board games with others on the weekends, and goes to church if he is "feeling up for it." (R. at 156–57, 168.) He stated that he performs daily chores, but that his parents need to give him several reminders to do so. (R. at 164.) When asked if he balances his checking account, he testified: "Not really. My mom is more the one who keeps track of that." (R. at 157.) He then clarified that he has never balanced his checking account by himself. (R. at 158.)

**F. Vocational Expert Testimony.**

After hearing testimony from Plaintiff, the ALJ examined a vocational expert. (R. at 183–85.) The ALJ presented a hypothetical individual who shared the same age, education, and past jobs as Plaintiff, and who is limited to medium exertional work, simple and routine tasks, occasional interaction with supervisors or co-workers but no interaction with the public, and would be off task eight percent of an eight-hour work day, in addition to regular breaks. (R. at 183.) The vocational expert testified that such an individual could not perform Plaintiff's companion position, but the individual could perform jobs that existed in significant numbers in the national economy, such as laundry worker, housecleaner, or laundry laborer. (R. at 183–84.)

The ALJ asked the vocational expert to identify the "maximum allowance for being absent" from work and the "maximum for being off task in an eight-hour workday" for the hypothetical

individual in the first scenario. (R. at 185.) The vocational expert testified that such an individual could be absent up to one day per month from work and off task up to ten percent of an eight-hour workday. (R. at 185.) Thus, no jobs exist in significant numbers in the national economy for the representative individual if he is off task more than ten percent of an eight-hour workday or absent more than one day a month. (*See* R. at 184–85.)

### III. THE ALJ'S DECISION

Following the evidentiary hearing, the ALJ issued a written opinion on August 23, 2018, concluding that Plaintiff did not qualify as disabled and denying him benefits. (R. at 39–53.) The ALJ followed the five-step evaluation process established by the Social Security Act to determine whether a disability exists. (R. at 41–53); 20 C.F.R. § 404.1520(a)(4); *see Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015) (describing the five-step sequential evaluation).

According to those regulations, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, the ALJ determines whether the claimant's medical impairments meet or equal an impairment in the Listings.[4] §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1. Between steps three and four, the ALJ must assess the claimant's residual functional capacity, accounting for the most that the claimant can do despite her physical and mental limitations. §§ 404.1520(e), 404.1545(a)(1), 416.920(a), 416.945(a). At step four, the ALJ assesses whether the claimant can perform her past work given her residual functional capacity. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, at step five, the

---

[4]     The Listings are a regulatory appendix of "the major body systems impairments that [the Social Security Administration] consider[s] to be severe enough to prevent an individual from doing any gainful activity." §§ 404.1525(a), 416.925(a).

ALJ determines whether the claimant can perform any work existing in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

In the instant case, at step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 22, 2011, which is the alleged onset date of his impairments. (R. at 41.) At step two, the ALJ concluded that Plaintiff suffers from Asperger's syndrome, obsessive compulsive disorder, ADHD, depression, and IBS, which significantly limit Plaintiff's ability to perform basic work activities. (R. at 42.) At step three, the ALJ determined that none of Plaintiff's impairments, individually or in combination, met or equaled a disability listing in the Listings, located at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 42.) Specifically, the ALJ held that Plaintiff's impairments did not meet or equal Listings 5.02 (gastrointestinal hemorrhaging), 5.06 (inflammatory bowel disease), 5.08 (weight loss due to any digestive disorder), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorder), 12.10 (Autism spectrum disorder), and 12.11 (neurodevelopmental disorders). (R. at 42.)

After step three, the ALJ determined that Plaintiff has the residual functional capacity to perform "medium work" with the following nonexertional limitations:

> [P]erforming simple, routine, and repetitive tasks but not at a production rate; making only simple work-related decisions; *no more than occasional interaction with supervisors and coworkers, but no interaction with the public*; tolerating few changes in a routine work setting; *in addition to normal breaks, would be off task 10 percent of the time in an eight-hour workday; would be absent one day per month.*

(R. at 44 (emphases added).)

Relevant to the present appeal, the ALJ explained that Plaintiff has moderate limitations in understanding, remembering, or applying information and in concentrating, persisting, or

maintaining pace.[5] (R. at 42–43.) The ALJ noted that this moderate limitation is supported by the evidence, in part, because Plaintiff "drives, *counts change, balances a checkbook*, uses a computer, plays video games, and cares for an individual with disabilities," and several medical opinions reported Plaintiff's average intelligence test results. (R. at 42–43 (emphasis added).) The ALJ also determined that Plaintiff has a moderate limitation in interacting with others. (R. at 43.) The ALJ noted Plaintiff's difficulties in reading the emotional cues of others but also explained that Plaintiff, with assistance, "is able to interact meaningfully enough to care for individuals with disabilities, attend[] church and engage in *various social activities* (i.e. going to the movies, bowling, miniature golf, dining out, etc.)." (R. at 43 (emphasis added).)

The ALJ also summarized Plaintiff's testimony that his IBS, depression, and other mental impairments cause him stomach pain, bouts of diarrhea, and an inability to focus or stay motivated. (R. at 44–45.) Of note, the ALJ mentioned Plaintiff's testimony about his prior work "as a *caregiver* for disabled individuals." (R. at 45 (emphasis).) The ALJ stated that "the job generally entails taking the individual out for activities," and that Plaintiff assists "with toileting and other basic care at times." (R. at 45, 49.) The ALJ noted that the job requires about 15-20 hours per week, but that Plaintiff regularly calls in sick. (R. at 45.) The ALJ recognized that, despite Plaintiff's ability to perform some of his companion duties, Plaintiff found the duties to be "challenging, even seemingly insurmountable at times, [and] the limitations found [in the residual functional capacity determination] preclude this sort of work." (R. at 49.)

The ALJ further discussed the specific residual functional capacity determination limiting Plaintiff to one absence per month and being off task ten percent of an eight-hour workday, in

---

[5]     Although these conclusions reside in the ALJ's analysis under step three, the ALJ clarified that the degree of mental limitations found in the step-three analysis were incorporated into the residual functional capacity assessment. (R. at 43.)

addition to regular breaks. The ALJ noted that Plaintiff's limitation of one absence per month was "consistent with [Plaintiff's] testimony." (R. at 47.) The ALJ also recognized the "acknowledgment by medical professionals of [Plaintiff's] ongoing [IBS] symptoms" and explained that these symptoms contributed to Plaintiff's need for time off task and absences. (R. at 48.) However, the ALJ concluded that additional limitations for time off task and absences per month were not warranted because of "normal to mild" medical findings. (R. at 48.) The ALJ further noted Plaintiff's "difficulties" in his companion role (i.e. lack of motivation, inability to tolerate stress, in ability to interact), but indicated that those "difficulties" were tied to the specific position, rather than Plaintiff's medical diagnosis. (R. at 49.) The ALJ also generally observed that Plaintiff suffered from "very significant mental limitations," which warranted many of the limitations in the residual functional capacity determination, generally. (R. at 47.)

The ALJ then considered the medical opinion evidence and assigned no more than partial weight to various opinions provided by Drs. Browne, Waaland, Kaul, Gladfelter, and Counselor Routh. (R. at 48–50.) The ALJ assigned limited or little weight to portions of the medical opinions provided by Drs. Browne, Waaland, and Kaul, concluding that the opinions focused on Plaintiff's ability to function in a work setting and therefore invaded the realm of vocational expert testimony. (R. at 49.) The ALJ assigned partial weight to other portions of Dr. Browne's opinion—specifically, that Plaintiff was unable to interact in a meaningful and productive manner and unable to tolerate more than minimal stress. (R. at 49.) The ALJ noted Counselor Routh's prolonged treatment relationship with Plaintiff but assigned "partial weight" to Counselor Routh's conclusion that Plaintiff's poor executive functioning creates a "barrier to gainful employment" because it invaded the realm of vocational expert testimony. (R. at 50.) Finally, the ALJ assigned "some, but not significant, weight" to Dr. Gladfelter's statements and opinions, explaining that "while the

13

[Plaintiff] certainly has a degree of limitation across many if not most areas of vocational functioning, the pertinent matter is the extent of functional limitation, which Dr. Gladfelter's opinions do not directly address." (R. at 49.)

After examining the medical opinions, the ALJ also noted the statements from Plaintiff's employers and parents. (R. at 51.) The ALJ gave "great weight" and "accepted as accurate" the observations described in these statements, including Plaintiff's struggles in his companion position, but the ALJ gave "limited weight to the extent conclusions are drawn as to [Plaintiff's] ability to function in a workplace generally." (R. at 51.) The ALJ explained that Plaintiff's responsibilities in his companion role "would quite reasonably be expected to present the claimant with significant stress" given the complexity of tasks involved, close interpersonal contact with others, and need to care for another person. (R. at 51.) Because of the nature of this work, the ALJ concluded that "any aspect of these opinions generalizing his difficulties in these settings to the workplace in general are given little weight." (R. at 51.)

At step four, the ALJ concluded that Plaintiff had no past relevant work. (R. at 51.)

At step five, the ALJ held that there were jobs that existed in significant numbers in the national economy for Plaintiff to perform. (R. at 52.) The ALJ noted that, normally, Plaintiff's ability to perform medium work would render him "not disabled." (R. at 52.) However, because of Plaintiff's "additional limitations," the ALJ relied on the vocational expert's testimony. (R. at 52.) The ALJ agreed with the vocational expert's testimony that, despite Plaintiff's residual functional capacity limitations, Plaintiff could perform jobs that existed in significant numbers in the national economy, such as work as a laundry worker, bus cleaner, or laundry laborer. (R. at 52.) The ALJ therefore concluded that the Plaintiff was not disabled. (R. at 52.)

## IV. STANDARD OF REVIEW

This Court upholds an ALJ's Social Security disability determination if "(1) the ALJ applied the correct legal standards and (2) substantial evidence supports the ALJ's factual findings." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 94 (4th Cir. 2020) (citing 42 U.S.C. § 405(g) and *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015)).

"Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Pearson*, 810 F.3d at 207 (internal quotation marks omitted). Substantial evidence thus requires more than a scintilla of evidence, but less than a preponderance of the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Between these two evidentiary thresholds lies a "zone of choice" where the ALJ's decision can go either way without interference by the courts. *See Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272–73 (8th Cir. 1988)). "'In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment' for the ALJ's." *Arakas*, 983 F.3d at 95 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).

## V. ANALYSIS

Plaintiff makes several arguments in his appeal to this Court. He contends the ALJ erred in (1) making several factual findings, such as Plaintiff's ability to balance a checkbook, count change, and provide care in a professional setting; (2) evaluating the medical opinions in the record; (3) determining the amount of social interaction that Plaintiff can tolerate; and (4) underestimating the amount of time off and absences Plaintiff would need from employment. (Pl.'s Mem. at 1–3.) Defendant responds generally that substantial evidence supports the ALJ's residual functional capacity determination because the ALJ reasonably accounted for Plaintiff's mental and gastrointestinal limitations. (Def.'s Mem. at 20–24.)

For the reasons stated below, this Court finds that the ALJ erred in denying Plaintiff's application for benefits. Specifically, the ALJ erred in evaluating Dr. Browne's and Dr. Gladfelter's opinions and failed to adequately explain the extent of Plaintiff's limitations for the amount of time he would need to be off task or absent from work. The Court concludes that the ALJ did not err in regard to the other points raised by Plaintiff. This Court addresses each of Plaintiff's four arguments in turn.

### A.  The ALJ Erred, in Part, In Making Certain Factual Findings, but Such Errors Are Harmless.

This Court affirms the ALJ's factual findings if supported by substantial evidence. *Arakas*, 983 F.3d at 94. Substantial evidence requires more than a scintilla of evidence, but less than a preponderance of the evidence. *Hancock*, 667 F.3d at 472. "'In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment' for the ALJ's." *Arakas*, 983 F.3d at 95 (quoting *Craig*, 76 F.3d at 589).

Plaintiff identifies three factual errors committed by the ALJ. First, Plaintiff argues the ALJ ambiguously stated that Plaintiff "provides care" for individuals with disabilities. (Pl.'s Mem. at 1.) Plaintiff states that such a phrase implies that Plaintiff administers medication or plans his client's activities, while Plaintiff's responsibilities involve merely driving his client to places. (Pl.'s Mem. at 1.) Second, Plaintiff asserts the ALJ erroneously relied on Plaintiff's ability to count change, despite Plaintiff performing such a job at a grocery store for only a short period time. (Pl.'s Mem. at 1.) Third, Plaintiff asserts that the ALJ inaccurately stated that Plaintiff balances his checkbook, despite evidence that Plaintiff's mother handles that responsibility. (Pl.'s Mem. at 1.)

Defendant argues that any error regarding Plaintiff's ability to balance a checkbook or count change is harmless because the ALJ limited Plaintiff to simple and routine tasks and no public interaction. (Def.'s Mem. at 25.) According to Defendant, such limitations preclude Plaintiff

from performing mathematical computations or interacting with the public as a cashier. (Def.'s Mem. at 25.) Defendant further argues that the ALJ accurately stated that Plaintiff cares for individuals with disabilities as a job based on Plaintiff's testimony that he performs such activities. (Def.'s Mem. at 26.)

### 1.  The ALJ Did Not Err in Characterizing the Nature of Plaintiff's Prior Work.

Substantial evidence supports the ALJ's characterization of Plaintiff's part-time work looking after an individual with Down's syndrome. The ALJ characterized Plaintiff's role in this work as a "caregiver." (R. at 45.) Regarding the job functions of the "caregiver" job, the ALJ stated that Plaintiff takes his client "out for activities; for example, he has taken him out to lunch and to his bowling league on Wednesday night" and that Plaintiff assists "with toileting and other basic care at times." (R. at 45, 49.)

Plaintiff argues that the term "caregiver" is ambiguous and may have led the ALJ to assume Plaintiff administers medication or manages his client's personal hygiene. (Pl.'s Mem. at 1.) The ALJ's characterization of the position, however, is identical to Plaintiff's testimony: "I worked as a *caregiver* for an individual with Down's syndrome." (R. at 154 (emphasis added).) Additionally, the ALJ's reference to Plaintiff "assisting with toileting and other basic care at times" has some support in the record. In her statement, Ms. Michaux mentioned that Plaintiff bathed, dressed, and fed her son in Plaintiff's companion role, although Ms. Michaux frequently had to assist and remind Plaintiff with these duties. (R. at 759.)

To the extent that the ALJ misstated the degree of Plaintiff's ability to perform these hygiene and basic care responsibilities, such error is harmless. "When confronted with an error committed by the ALJ, the Court must determine whether to apply the harmless error doctrine." *Gorrell v. Saul*, No. 3:18cv538, 2019 WL 3939065, at *16 (E.D. Va. July 31, 2019) (citing *Mascio*,

780 F.3d at 639; *Sharp v. Colvin*, 660 F. App'x 251, 252 (4th Cir. 2016)). To determine whether an error is harmless, courts must consider "the likelihood that the result would have been different" had the error not occurred. *Id.* (quoting *Shineski v. Sanders*, 556 U.S. 396, 411 (2009)). The burden of establishing that an error was harmful falls on the "the party attacking the agency's determination." *Shineski*, 556 U.S. at 409.

Here, the limitations included by the ALJ in the residual functional capacity determination precluded Plaintiff from performing his existing role as a companion. (R. at 44, 49, 183–84.) Thus, even if the ALJ erred in failing to acknowledge Plaintiff's limitations in performing some of the hygiene and basic care duties of his companion job, such error would be harmless because the residual functional capacity determination precludes Plaintiff from performing this kind of companion work.

### 2.  The ALJ Did Not Err in Evaluating Plaintiff's Ability to Count Change.

Substantial evidence supports the ALJ's statement that Plaintiff can count change. Plaintiff testified that he worked as a cashier at a grocery store before he was let go from the position because of inconsistent attendance. (R. at 159, 162, 175, 664.) On brief to this Court, Plaintiff states that he counted change in this role, and he concedes that he "can do math and simple math computations." (Pl.'s Mem. at 1.) There is thus substantial evidence demonstrating that Plaintiff can count change.

Plaintiff nonetheless argues that the ALJ's statement regarding Plaintiff's ability to count change—which he performed while working at a grocery store—implies that Plaintiff has an ability to interact with the public. (Pl.'s Mem. at 1.) In discussing Plaintiff's ability to interact with others, however, the ALJ does not mention Plaintiff's ability to count change. (*See* R. at 43.) Moreover, the ALJ ultimately limited Plaintiff to "no interaction with the public." (R. at 44.) There

is thus no indication that the ALJ, in noting that Plaintiff could count change, inferred that Plaintiff could interact with the public. Because substantial evidence supports Plaintiff's ability to count change, the ALJ did not err in making this factual finding.

    3.  The ALJ Erred in Determining Plaintiff Can Balance a Checkbook, but Such Error Is Harmless.

Substantial evidence does not support the ALJ's statement that Plaintiff can balance a checkbook. Plaintiff and his parents stated that Plaintiff has never balanced his checkbook and relies on his parents to manage his checking account. (R. at 157–58, 705.) There is thus no evidence supporting Plaintiff's ability to balance a checkbook.

However, such error is harmless because, even if the ALJ had recognized Plaintiff's inability to balance a checkbook, the ALJ would not have rendered a different conclusion. *Gorrell*, 2019 WL 3939065, at *16 (explaining harmless error standard considers "the likelihood that the result would have been different" had the error not occurred). The ALJ only noted Plaintiff's ability to balance a checkbook twice—in determining that Plaintiff has moderate limitations in understanding, remembering, or applying information and in concentrating, persisting, or maintaining pace. (R. at 42-43.) The ALJ did not exclusively rely on Plaintiff's ability to balance a checkbook in support of these moderate limitations. The ALJ also relied on his ability to drive, use a computer, play video games, count change, and take care of an individual with Down's syndrome, as well as several medical opinions reporting Plaintiff's average intelligence test results. (R. at 42-43.) In light of this other evidence, Plaintiff's inability to balance a checkbook, alone, would not alter Plaintiff's limitations in these two areas. Moreover, as Defendant points out, the ALJ crafted a residual functional capacity that limited Plaintiff, in part, to simple and routine tasks. (*See* Def.'s Mem. at 25.) Such a limitation precludes Plaintiff from performing more advanced

computational or financial work. Because the ALJ's conclusions would not have changed, the ALJ's error in finding Plaintiff able to balance a checkbook is harmless.

**B.  The ALJ Did Not Err in Giving Limited Weight to Medical Opinions Regarding Plaintiff's Ability to Work but Erred in Evaluating Dr. Browne's and Dr. Gladfelter's Opinions.**

Plaintiff argues that the ALJ improperly discounted or ignored the medical opinions in the record. (Pl.'s Mem. at 3.) Defendant contends that the ALJ evaluated the medical opinions as required by the relevant regulations and was entitled to discount opinions which related to Plaintiff's ability to work because such determination is reserved exclusively for the ALJ. (Def.'s Mem. at 29–30.)

In general, an ALJ must consider all medical opinions in the record. §§ 404.1527(c), 416.927(c). An opinion provided by a treating source, however, is given special significance by the regulations. §§ 404.1527(c)(2), 416.927(c)(2). A treating source is a "medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." §§ 404.1527(a)(2), 416.927(a)(2). Under the "treating physician rule," an ALJ must give a medical opinion from a treating source controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence." §§ 404.1527(c)(2), 416.927(c)(2); *see Arakas*, 983 F.3d at 106; SSR 96-2p, 1996 WL 374188 (July 2, 1996).[6] If a medical opinion from a treating source is not entitled to controlling weight, the ALJ

---

[6]     Effective March 27, 2017, the Social Security Administration rescinded SSR 96-2p and what is known as the "treating physician rule." 82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). Plaintiff filed his application for benefits in 2012, before the Social Security Administration rescinded the rule. (R. at 585, 587.)

must consider certain factors to determine the weight to afford the opinion. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6); *see Arakas*, 983 F.3d at 106.

In deciding the appropriate weight to assign a medical opinion, whether that opinion is a non-treating source opinion or treating source opinion that is not entitled to controlling weight, an ALJ must consider the following factors: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors brought to the ALJ's attention which tend to support or contradict the medical opinion. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6).

Generally, a reviewing court should not disturb an ALJ's decision regarding the weight given to a medical opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' or has failed to give a sufficient reason for the weight afforded a particular opinion." *Dunn*, 607 F. App'x at 267 (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)).

Nevertheless, opinions on issues reserved exclusively to the Commissioner or the ALJ "are not medical opinions." §§ 404.1527(d), 416.927(d). Such issues are those that are "dispositive of a case; i.e., that would direct the determination or decision of disability." §§ 404.1527(d), 416.927(d). For example, "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the ALJ] will determine that [a claimant] is disabled." §§ 404.1527(d)(1), 416.927(d)(1). Additionally, an ALJ has the "final responsibility" to determine a claimant's residual functional capacity; however, the ALJ must still "consider" a medical source's opinion as to a claimant's residual functional capacity. §§ 404.1527(d)(2), 416.927(d)(2).

Finally, an ALJ will not give any "special significance to the source of an opinion" on a dispositive issue, and thus the controlling weight warranted by the treating physician rule does not apply to opinions on dispositive issues. §§ 404.1527(d)(3), 416.927(d)(3).

In the instant case, the ALJ assigned no more than partial weight to several opinions from medical sources, including the opinions of Drs. Browne, Waaland, Kaul, and Gladfelter, as well as the opinion of Counselor Routh.

1.  The ALJ Erred, in Part, in Evaluating Dr. Browne's Opinion.

The ALJ considered the opinions of consultative examiner Dr. Browne. (R. at 49.) The ALJ credited Dr. Browne's opinion that Plaintiff be limited to simple and repetitive tasks. (R. at 49.) Dr. Browne also opined that Plaintiff was unable to interact in a meaningful and productive manner and that Plaintiff was unable to tolerate more than minimal stress, but the ALJ discounted these opinions as inconsistent with the record. (R. at 49.) Specifically, the ALJ explained that Plaintiff had "demonstrated at least a partial ability to perform these activities" in his current companion position. (R. at 49.) The ALJ therefore gave these opinions partial weight. (R. at 49.)

The ALJ did not err in giving these opinions of Dr. Browne partial weight because the ALJ relied on substantial evidence that contradicted Dr. Browne's opinions regarding Plaintiff's ability to interact and manage stress. As described above and further along, Plaintiff's work history does demonstrate a limited ability to interact and manage stress. This evidence adequately supports the ALJ's conclusion.

The ALJ also considered Dr. Browne's opinions (1) that Plaintiff is likely unable "to perform [simple and repetitive] work activities on a consistent basis whereby he could complete even a partial workday much less a full workday," and (2) that Plaintiff's depression and lack of motivation "would probably interfere with him maintaining regular attendance in the workplace."

(R. at 46, 830.) The ALJ explained that little weight was given to these two opinions "because it leaves the realm of a true medical opinion and becomes more vocational in nature." (R. at 49.) The ALJ thus reasoned that these portions of Dr. Browne's opinion spoke to Plaintiff's ability to work—a dispositive issue reserved for the ALJ. *See* §§ 404.1527(d)(1), 416.927(d)(1).

The ALJ erred in evaluating these two opinions. First, the opinion that Plaintiff is unable to "to perform [simple and repetitive] work activities on a consistent basis" is not akin to opining that Plaintiff is "unable to work." *See* §§ 404.1527(d)(1), 416.927(d)(1). Rather, Dr. Browne opined on Plaintiff's ability to sustain simple and repetitive work tasks specifically—not his ability to work, in general. This portion of Dr. Browne's opinion was therefore directed at a specific work function rather than Plaintiff's ability to work in a position available in the national economy. *Cf. Thompson v. Astrue*, 442 F. App'x 804, 808 (4th Cir. 2011) (unpublished per curiam opinion) (concluding that a medical opinion stating claimant was "'permanently and totally disabled' and 'will never be able to perform substantial gainful work activity'" was an opinion on a dispositive issue reserved for the ALJ).

Second, the ALJ also erred in evaluating Dr. Browne's opinion that Plaintiff's depression and lack of motivation "would probably interfere with him maintaining regular attendance in the workplace." (R. at 46, 830.) The effect of Plaintiff's impairments on his ability to achieve "regular attendance" at work concerns Plaintiff's ability to even show up to work. An ability or inability to show up to work does not pertain to a dispositive issue because it does not relate to Plaintiff's work performance. Instead, such an opinion is a medical conclusion because it reflects the effect of Plaintiff's mental impairments on his motivation to attend work, based on factual observations of Plaintiff's behavior and medical diagnoses. The ALJ therefore erred in evaluating the above portions of Dr. Browne's opinion.

23

2.  The ALJ Did Not Err in Evaluating the Opinions of Dr. Kaul, Dr. Waaland, and Counselor Routh.

The ALJ gave Dr. Kaul's and Dr. Waaland's opinions "limited weight" and gave Counselor Routh's opinion "partial weight." (R. at 49-50.) The ALJ highlighted Dr. Kaul's opinion that Plaintiff "remains unlikely to be able to maintain independent employment at this time." (R. at 47, 1141.) The ALJ also focused on Dr. Waaland's opinion that Plaintiff "lacks energy/initiative and execution skills for independence and gainful employment." (R. at 47, 1127.) The ALJ further noted Counselor Routh's opinion that Plaintiff's poor executive functioning creates a "barrier to gainful employment." (R. at 50, 1280.) The ALJ reasoned that these opinions warranted partial or limited weight because they invaded the realm of vocational expert testimony. (R. at 49–50.) Like Dr. Browne's opinion, the ALJ reasoned that the above opinions spoke to Plaintiff's ability to work—a dispositive issue reserved for the ALJ. *See* §§ 404.1527(d)(1), 416.927(d)(1).

The ALJ did not err in evaluating the above medical opinions of Dr. Kaul, Dr. Waaland, and Counselor Routh. These opinions opine on Plaintiff's ability to sustain gainful employment, which is a dispositive issue reserved for the ALJ. Dr. Kaul's opinion that Plaintiff could not maintain employment and Counselor Routh's opinion that Plaintiff's impairments barred him from gainful employment are akin to stating that Plaintiff is "unable to work." *See* §§ 404.1527(d)(1), 416.927(d)(1). The ALJ was further entitled to not give controlling weight to this portion of Dr. Kaul's opinion, even though he is one of Plaintiff's treating physicians. *See* §§ 404.1527(d)(3), 416.927(d)(3).

In addition to the opinions above, however, Dr. Waaland also provided numerous other opinions. The ALJ identified Dr. Waaland's conclusions that Plaintiff has "extremely low adaptive functioning skills"; the cognitive profile of an individual with Asperger's syndrome; superior intelligence but difficulty with efficient processing, executing and attention; depression; and

difficulty with independent living. (R. at 47.) Although the ALJ does not explicitly address the weight of these opinions, the ALJ generally gave Dr. Waaland's opinion limited weight and otherwise noted that some of Dr. Waaland's descriptions "appear excessive" as compared to Plaintiff's testimony regarding his work, attendance at work, and activities at home. (R. at 47, 49.) Although somewhat lacking in its specificity, the ALJ did not err in giving these opinions from Dr. Waaland limited weight because the ALJ addressed the consistency and supportability of Dr. Waaland's opinions by noting that the opinion was consistent with other medical opinions but inconsistent with some evidence in the record. Thus, substantial evidence supports the ALJ's conclusion. The ALJ therefore did not err in evaluating the opinions of Dr. Kaul, Dr. Waaland, and Counselor Routh.

### 3. The ALJ Erred in Evaluating Dr. Gladfelter's Opinion.

The ALJ erred in her treatment of the opinion of Dr. Gladfelter, one of Plaintiff's treating physicians. The ALJ gave Dr. Gladfelter's opinion "some, but not significant, weight." (R. at 49.) The ALJ cursorily explained that she assigned less than controlling weight to Dr. Gladfelter's opinions because, "while [Plaintiff] certainly has a degree of limitation across many if not most areas of vocational functioning, the pertinent matter is the extent of functional limitation, which Dr. Gladfelter's opinions do not directly address." (R. at 49.)

As an initial matter, Dr. Gladfelter is one of Plaintiff's treating physicians, and therefore the ALJ must give her opinion controlling weight if (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence." §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ does not give the treating physician's opinion controlling weight, the ALJ must determine the appropriate weight based on the factors as set forth above. §§ 404.1527(c)(2)–(6); 416.927(c)(2)–(6); *see Arakas*, 983 F.3d at 106.

25

Here, however, the ALJ never conducted this analysis. Instead, the ALJ concluded that Dr. Gladfelter's opinions could be functionally ignored because Dr. Gladfelter's opinions do not speak—in the ALJ's opinion—to the *extent* of the functional limitations needed. (R. at 49.) Additionally, the ALJ noted that the limitations included in the residual functional capacity crafted by the ALJ already "encompasses those things specified by this doctor," such as "difficulty with judgment" and "poor time management skills." (R. at 49.)

The ALJ's views are incorrect. In fact, Dr. Gladfelter offered opinions as to the extent of Plaintiff's limitations by assigning mild to severe limitations to various functional limitations. (R. at 1285–86.) The residual functional capacity determination crafted by the ALJ also implicitly rejected some of these opinions by not encompassing the limitations suggested by Dr. Gladfelter. For example, Dr. Gladfelter opined that Plaintiff had severe limitations in sustaining concentration, while the ALJ concluded that Plaintiff's limitation in concentrating, persisting, or maintaining pace was only moderate. (*Compare* R. at 1285 *with* R. at 42.)

Additionally, the ALJ's analysis is entirely devoid of any discussion which would indicate that the ALJ engaged in the treating physician evaluation as set forth above. The ALJ does not address whether Dr. Gladfelter's opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or "not inconsistent with the other substantial evidence." *See* §§ 404.1527(c)(2), 416.927(c)(2). Further, even if this analysis was done, there is no indication that the ALJ considered the factors required to evaluate the appropriate weight of an opinion, nor does her analysis include a discussion of any factor other than the consistency of Dr. Gladfelter's opinion. *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 385–86 (4th Cir. 2021) (finding error where ALJ failed to discuss or indicate consideration of the factors for assigning weight to a

medical opinion). Given these failures, the ALJ erred in her consideration of Dr. Gladfelter's opinion.

In sum, the ALJ erred in evaluating portions of Dr. Browne's opinion because some of his conclusions did not directly opine on Plaintiff's ability to work generally. The ALJ did not err in evaluating the opinions of Dr. Kaul, Dr. Waaland, and Counselor Routh because these opinions concerned Plaintiff's ability work, a dispositive issue reserved to the ALJ. Finally, the ALJ erred in her evaluation of the opinions of Plaintiff's treating physician, Dr. Gladfelter.

### C. The ALJ Did Not Err in Limiting Plaintiff to Occasional Interaction with Co-workers and Supervisors.

Plaintiff argues that the ALJ erred in her assessment of Plaintiff's ability to tolerate social interaction and by failing to include more significant limitations on Plaintiff's interaction with co-workers and supervisors, such as limiting Plaintiff to minimal to no contact with co-workers. (Pl.'s Mem. at 1–2.) Plaintiff also contends the ALJ put too much weight on his ability to attend social activities because many of the activities involved little social interaction, and the activities that did require social interaction were too stressful and Plaintiff therefore stopped doing them. (Pl.'s Mem. at 1.)

Defendant argues that the ALJ accurately noted Plaintiff's ability to play computer games with others, attend Bible study and Asperger's group meetings, and go out with friends as evidence supporting Plaintiff's ability to tolerate some social interaction. (Def.'s Mem. at 26–27.) Defendant contends that the ALJ reasonably accounted for Plaintiff's limitations by restricting him to no public interaction and only occasional interaction with co-workers. (Def.'s Mem. at 26–27.)

After step three of the ALJ's analysis, but before making a determination whether the claimant can perform past relevant work, the ALJ must assess the claimant's residual functional capacity. §§ 404.1545(a)(1), 416.945(a). Residual functional capacity "is 'the most' the claimant

'can still do despite' physical and mental limitations that affect her ability to work." *Mascio*, 780 F.3d at 635 (quoting § 416.945(a)(1)). In analyzing a claimant's abilities, the ALJ must first assess the nature and extent of the claimant's physical limitations and then determine the claimant's residual functional capacity for work activity on a regular and continuing basis. §§ 404.1545(b), 416.945(b). The ALJ may rely on both medical evidence in the record and the claimant's credible testimony to determine the residual functional capacity. §§ 404.1545(e), 416.945(e). However, the "final responsibility" for determining the residual functional capacity of a claimant lies with the ALJ, not a medical provider. §§ 404.1527(d)(2), 416.927(d)(2).

In crafting Plaintiff's residual functional capacity, the ALJ limited Plaintiff, in part, to "no more than occasional interaction with supervisors and coworkers, but no interaction with the public." (R. at 44.) In rendering these conclusions, the ALJ relied primarily on Plaintiff's ability to perform certain social activities and work functions, as well as the medical opinion evidence. (*See* R. at 43, 46–50.)

Substantial evidence supports the ALJ limiting Plaintiff to occasional interaction with co-workers and supervisors for two reasons. First, there is evidence in the record of Plaintiff's ability to engage in some social activities and work functions involving interaction with other people. In his companion role, Plaintiff took his clients to public places to perform activities, such as going to the gym, getting food, or going to the movies. (R. at 155.) These activities inherently involve some social interaction, such as purchasing the movie tickets or ordering food from strangers. Plaintiff's employment as a companion also involved frequent interaction with his client, which shows Plaintiff had some ability to interact with a peer. Additionally, according to the employer statements, Plaintiff received guidance and supervision from his clients' parents. (R. at 759.) Although receiving this supervision weighs against Plaintiff's ability to independently perform his

tasks, it demonstrates Plaintiff having at least some ability to tolerate interaction with another person in a supervisory role.

Plaintiff also testified about his limited ability to do social activities such as going to church if he is "feeling up to it" and playing board games on the weekends. (R. at 156, 168.) Moreover, Plaintiff testified that he gets very stressed interacting with people "for extended periods of time." (R. at 162.) The ALJ accounted for this limitation, however, by limiting Plaintiff to no public interaction. Plaintiff's statement that he is stressed with people "for extended periods of time" also implies that Plaintiff can tolerate the occasional interaction with another person, but he cannot tolerate sustained or frequent interaction. Plaintiff's ability to engage in some interaction in work and social settings thus supports the ALJ's decision to limit Plaintiff to occasional interaction with co-workers and supervisors.

Second, the medical opinion evidence supports the ALJ's prescribed limitations as to social interaction. Counselor Routh and Dr. Gladfelter both opined that Plaintiff had only a "moderate" limitation in responding appropriately to supervision and assessments. (R. at 1282, 1285.) Having only a "moderate" limitation—compared to a marked or extreme limitation—means that Plaintiff can tolerate some interaction with a supervisor or co-worker. *See* Pt. 404, Supt. P, App. 1, § 12.00(F)(2)(a)–(e) (describing the different degrees of limitation and defining a "moderate" limitation as a claimant's ability to perform a particular function being "fair").

Dr. Gladfelter also opined that Plaintiff's ability to interact with co-workers is "very limited," while Counselor Routh stated that Plaintiff had "very limited social skills." (R. at 1280, 1285.) Similarly, Dr. Browne opined that Plaintiff's capacity to interact with co-workers in a "meaningful and productive manner" is "marginal." (R. at 830.) Although these portions of the opinions have stronger language regarding Plaintiff's limitations with social interaction than

ultimately adopted by the ALJ, they do not prohibit interaction with co-workers outright. Furthermore, the ALJ accounted for Plaintiff's "very limited" and "marginal" social skills by limiting Plaintiff to no interaction with the public. For these reasons, the medical evidence demonstrates that Plaintiff has at least some ability to tolerate social interaction.

In sum, although Plaintiff experiences stress in circumstances involving social interaction, Plaintiff's ability to engage in some interaction in work and social settings and the medical opinion evidence demonstrate that Plaintiff has at least some ability to tolerate social interaction. This evidence is sufficient to support the ALJ limiting Plaintiff to only occasional interaction with co-workers and supervisors. Substantial evidence thus supports the ALJ's residual functional capacity determination as to social interaction.

### D.  The ALJ Erred in Evaluating the Amount of Time Off or Absences Plaintiff Would Need in a Work Setting.

Plaintiff argues that the ALJ underestimated the amount of time Plaintiff would have to miss from a full-time job in limiting Plaintiff to ten percent time off task and one absence per month, which are limitations in residual functional capacity. (Pl.'s Mem. at 2.) Plaintiff points to Dr. Browne's opinion, his former employers' statements, and his own testimony in support of Plaintiff being unable to maintain regular attendance at a job. (Pl.'s Mem. at 2.) Plaintiff contends that he already fails to maintain regular attendance at his part-time job caring for an individual with Down's syndrome. (Pl.'s Mem. at 2.)

In conducting a residual functional capacity analysis, an ALJ must provide a "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Mascio*, 780 F.3d at 636). Such narrative discussion helps this Court conduct a meaningful review of the basis for the ALJ's ruling. *Id*. The

ALJ must therefore discuss "which evidence the ALJ found credible and why" and conduct "a specific application of the pertinent legal requirements to the record evidence." *Id.* (quoting *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)). In other words, a sufficient residual functional capacity analysis must include: "(1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019), *as amended* (Feb. 22, 2019).

Here, in the residual functional capacity determination, the ALJ concluded that Plaintiff would be off task for ten percent of an eight-hour workday, which amounts to forty-eight minutes of off-task time, in addition to regular breaks. (R. at 44.) The ALJ also found that Plaintiff would be absent from work one day per month. (R. at 44.) The ALJ included these limitations based upon Plaintiff's "very significant mental limitations." (R. at 47.) The ALJ also acknowledged that Plaintiff's IBS-related symptoms "contribute[] to limitations to time off task and absences." (R. at 48.) The ALJ recognized the "acknowledgement by medical professionals of [Plaintiff's] ongoing [gastrointestinal] symptoms." (R. at 48.) The ALJ also "accord[ed] deference to [Plaintiff's] allegations" and found that these facts contributed to a need to limit Plaintiff to medium work and for limitations for time off task and absences. (R. at 48.) Regarding Plaintiff's monthly absences specifically, the ALJ explained that Plaintiff was limited to one absence per month, "consistent with [his] testimony." (R. at 47, 49.) Nevertheless, the ALJ concluded that "additional limitation [beyond that determined by the ALJ] is not borne out by the normal to mild findings" related to Plaintiff's gastrointestinal impairments. (R. at 48.)

Although the ALJ properly explained that Plaintiff required limitations regarding time off task and absences, the ALJ did not adequately explain her reasoning in determining the *extent* of these limitations. Specifically, the ALJ erred in interpreting the facts and did not provide a logical

explanation of her evaluation of Plaintiff's testimony, the medical records, and the medical opinion evidence as it relates to the extent of Plaintiff's limitations for time off task and absences.

The ALJ reasoned, for example, that one absence per month was "consistent with [Plaintiff's] testimony"; however, Plaintiff never testified that he was usually absent one day per month from work. Plaintiff stated that, in his companion job, he is required to work three to five hours a day, five to six days a week. (R. at 169.) He testified, though, that he has to call out of work one to two times *per week* because of his depression or IBS symptoms. (R. at 170, 223.) In addition, although Plaintiff also worked briefly for a grocery store, the store ultimately terminated his employment because of his poor attendance record. (R. at 177.) Based on this testimony, the ALJ erred in reporting that Plaintiff testified he was typically absent one day a month.[7]

The ALJ's analysis was also internally conflicting, specifically in regard to Plaintiff's credibility. On the one hand, the ALJ found that Plaintiff's impairments could be reasonably expected to produce his alleged symptoms but concluded that his "statements concerning the intensity, persistence and limiting effects of these symptoms . . . are not entirely consistent with the medical evidence and other evidence in the record." (R. at 45.) Elsewhere, however, the ALJ credited Plaintiff's testimony regarding his symptoms. (R. at 48 ("accord[ing] *deference* to [Plaintiff's] allegations in finding him limited to medium exertion . . . and further find[ing] that

---

[7]     The ALJ may have mistakenly concluded that Plaintiff testified he was typically absent one day per month based upon different testimony in which Plaintiff provided an anecdote about his need to leave work early, as described by the ALJ:

> On one recent occasion, after driving [his client] to gymnastics practice, [Plaintiff] felt unable to bring him home. It was dark and raining, and the claimant felt especially depressed; feeling he should not drive him in that state, he called his parents for assistance. He called in sick the next day. [Plaintiff] estimated this *sort of issue occurs at a frequency approaching once per month*, . . . .

(R. at 45 (emphasis added).)

this contributes to limitations to *time off task and absences*" (emphases added)).) The ALJ also found that Plaintiff's mental impairments "impose significant mental limitations," which warranted the limitations in the residual functional capacity, including time off task and absences. (R. at 45, 47.) Regarding Plaintiff's gastrointestinal symptoms, the ALJ recognized the "acknowledgement by medical professionals of [Plaintiff's] ongoing [gastrointestinal] symptoms." (R. at 48.) The ALJ thus appears to simultaneously credit and discredit Plaintiff's testimony regarding the extent and limiting effects of both his mental and physical symptoms, but provides no explanation for this inconsistent treatment.

The ALJ also credited other evidence in the record that supports Plaintiff's testimony regarding his limitations for time off task and absences. Regarding absences, Plaintiff testified that his impairments prevent him from regularly attending work, such as attending his college courses, his grocery store position, and his companion position. (R. at 158–59, 169–71, 176–77, 223, 826.) Regarding time off task, Plaintiff stated that, in his role as a companion, he works three to five hours per day, but "closer to three," and that he has to arrive late or leave early two to three times per week because of his symptoms. (R. at 158–59, 169–70.) At a prior hearing, Plaintiff explained that when he experienced stomach issues, he might be forced to stay in the bathroom for twenty minutes at a time, multiple times in a day. (R. at 213.) He estimated this sort of "gastrointestinal distress" occurs more than 100 times per year. (R. at 208.)

The ALJ credited statements from Plaintiff's employers and parents supporting Plaintiff's testimony about the extent of his symptoms and their limiting effects. For example, Ms. Zatkulak, Plaintiff's employer, stated that she cannot depend on Plaintiff to be available on scheduled dates for work "as he frequently calls in sick at the last minute." (R. at 731.) Ms. Michaux similarly stated that Plaintiff is "sick often and frequently absent." (R. at 759.) Plaintiff's parents stated that

his symptoms make it difficult for him to "have daily commitments," and that his depression in particular can cause him to sleep all day and night and otherwise "shut down." (R. at 702, 708.) His parents also noted that Plaintiff "constantly starts projects and does not complete them." (R. at 707.) The ALJ gave these observations from Plaintiff's employers and parents "great weight." (R. at 51.)

Despite this evidence, the ALJ concluded that "additional limitation [for time off task and absences] is not borne out by the normal to mild [gastrointestinal] findings." (R. at 48.) According to the ALJ, those "normal to mild findings" included negative gastric empty studies, ultrasounds, and colon studies, as well as some improvement with medication. (R. at 48.) In further explanation, the ALJ wrote that Plaintiff's "ability to function within a work environment necessarily depends on the work environment," indicating that the functional limitations and symptoms experienced by Plaintiff in his current position as a companion are unlikely to be present in a less stressful job. (*See* R. at 50.) As a result, the ALJ gave little weight to any opinion which concluded that the specific IBS and mental limitations experienced in Plaintiff's current companion position would continue in other positions or that those limitations would present barriers in future jobs. (*See* R. at 49, 51.) Having so discounted this evidence, the ALJ relied on the existence of normal to mild gastrointestinal findings to support the proposed limitations for time off task and absences from work. Thus, the ALJ concluded that normal to mild gastrointestinal findings, together with a less stressful job, would result in fewer gastrointestinal symptoms in the future.

The ALJ, however, did not properly explain how she derived these conclusions from the presence of normal to mild gastrointestinal findings, nor how she reconciled these conclusions with contradictory evidence. The normal to mild gastrointestinal findings cited by the ALJ occurred from 2010 through 2013, with one test being conducted in 2016. (R. at 48.) These medical

34

records reflect that, during this same period, Plaintiff still suffered from significant gastrointestinal symptoms, including frequent bowel movements, blood and mucus in stool, rectal pain, abdominal pain, change in bowel habits, constipation, gas, nausea, and rectal bleeding. (R. at 813 (October 2011), 805 (April 2012), 980 (June 2013).) The ALJ noted that in 2011, Plaintiff experienced some improvement with medication in the morning, but also that he was prescribed medication and physical therapy in 2013. (R. at 48.) During this period, Plaintiff was employed in his companion position when his employer reported his significant gastrointestinal symptoms. (R. at 596–99, 610–11, 731–32, 760–61.) Plaintiff's gastrointestinal symptoms continued after this period as well and he was diagnosed with gastroparesis (R. at 170, 208, 980), which is a condition that "results in delayed emptying of the bowels." *Stedman's Medical Dictionary* 733 (27th ed. 2000). The correlation between the normal to mild medical findings and Plaintiff's purportedly less severe symptoms is therefore not evident in the medical records,[8] as implied by the ALJ. The ALJ also does not cite any medical opinion evidence that the normal to mild findings are predictive of Plaintiff's future symptoms or how those symptoms might change depending on the degree of stress experienced by Plaintiff.

Additionally, to the extent that the ALJ's conclusion relies upon the ALJ's judgment regarding the causes or anticipated prognosis of Plaintiff's gastrointestinal symptoms, such conclusions would be impermissible. While it is clear that "a mere recitation of medical findings is not an improper medical determination by an ALJ . . . an ALJ acts inappropriately when there is an attempt to 'arrive at some conclusion' about medical evidence or a 'tendency to interpret,

---

[8]     This is unsurprising considering that IBS is "a condition characterized by gastrointestinal signs and symptoms including constipation, diarrhea, gas, and bloating, *all in the absence of organic pathology*." *Stedman's Medical Dictionary*, Westlaw 881440 (Nov. 2014) (emphasis added). The "normal to mild findings" in Plaintiff's gastric and colon studies are therefore not necessarily inconsistent with Plaintiff suffering from IBS-related symptoms.

rather than weigh, the evidence.'" *Johnson on behalf of A.J.S. v. Comm'r of Soc. Sec. Admin.*, No. 0:17cv01201, 2018 WL 4214370, at *2 (D.S.C. Sept. 5, 2018) (quoting *Anderson v. Berryhill*, C/A No. 6:16-cv-3550, 2018 WL 1531558, at *3 (D.S.C. Mar. 29, 2018)). An ALJ cannot draw his own medical conclusions, and doing so is error. *See Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) (noting that the ALJ impermissibly drew his own medical conclusions from the data without an expert's help); *Forquer v. Colvin*, No. 1:15cv57, 2016 WL4250364, at *6-8 (N.D.W. Va. Aug. 11, 2016) (finding the ALJ erred in relying on activities of daily living to substitute his own opinion for that of experts); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("[A]n ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so."). Because the ALJ cannot know whether Plaintiff's physical and mental limitations will resolve with a less stressful job, and because no evidence exists in the record opining that a change in position will resolve Plaintiff's symptoms, the ALJ's reliance on normal to mild gastrointestinal findings to reach this conclusion was in error. For these reasons, substantial evidence does not support the ALJ's conclusion that Plaintiff's "normal to mild [medical] findings" indicate a lack of future symptoms and that Plaintiff could tolerate less time off or fewer absences per month than he currently experiences.

Finally, in light of the medical opinion conclusions by this Court above, *see* discussion *supra* Section V.B. pp. 20–27, the ALJ needs to reconsider the medical opinions relevant to Plaintiff's limitations for being off task and absent. Dr. Browne opined, for example, that Plaintiff's "depression and lack of motivation would probably interfere with him maintaining regular attendance in the workplace."[9] (R. at 46, 830.) Dr. Gladfelter, Plaintiff's primary care and

---

[9]     As analyzed above, this conclusion does not opine on a dispositive issue, and the ALJ was required to consider it.

treating physician, similarly opined that Plaintiff had "significant gastrointestinal issues, most significantly severe chronic constipation and gastroparesis." (R. at 1215.) She further opined that treatment strategies had been unsuccessful, that Plaintiff would be severely limited in getting to work on time, and that Plaintiff's gastrointestinal issues would affect his ability to complete a full shift. (R. at 1215, 1285.) Upon remand, the ALJ will need to reconsider the weight of these medical opinions in formulating Plaintiff's limitations for time off task and absences.

In sum, the ALJ failed to adequately explain how she determined the extent of Plaintiff's limitations for time off task and absences. The ALJ noted that "while the [Plaintiff] certainly has a degree of limitation across many if not most areas of vocational functioning, *the pertinent matter is the extent of functional limitation*." (R. at 49 (emphasis added).) Yet, having made this observation, the ALJ's opinion is devoid of any discussion related to the extent of the time off task limitation specifically, and the ALJ does not otherwise explain her inconsistent conclusions concerning the weight of the evidence relevant to both time off task and absences. The ALJ does not, therefore, explain how the evidence supports her decision to limit Plaintiff to forty-eight minutes of additional break time, as opposed to more or less break time, and one absence per month. While the ALJ's opinion does cite facts from the record that could be relevant to this analysis, the ALJ fails to build a logical bridge from that evidence to her conclusions. *See Monroe*, 826 F.3d at 189 (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). For this reason, the ALJ's discussion is insufficient and remand is warranted.

Accordingly, the Court recommends remand for the ALJ to consider the record evidence regarding Drs. Browne and Gladfelter's opinions as required by the regulations, to consider Plaintiff's testimony that he is typically absent from work one or two times per week, and, having

considered this evidence, articulate specific reasons why the limitations imposed adequately address Plaintiff's "very significant" mental limitations and IBS-related symptoms.[10]

## V. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) be GRANTED, Defendant's Motion for Summary Judgment (ECF No. 18) be DENIED, and the final decision of the Commissioner be VACATED and REMANDED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Henry E. Hudson, to the address and email address provided by the Plaintiff, and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

_____

Elizabeth W. Hanes
United States Magistrate Judge

Richmond, Virginia
Date: February 25, 2021

---

[10]     Plaintiff's claim has been pending nearly nine years, since June 2012. Although this fact weighs in favor of remanding for benefits, remanding for a rehearing would allow the ALJ to consider the errors found herein, but also to reopen the record for more evidence if appropriate. *Cf. Arakas*, 983 F.3d at 112 (remanding for a calculation of benefits); *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974) (same).